Filed 6/28/21  Olango v. City of El Cajon CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| LUCY OLANGO et al., <br><br> Plaintiffs and Appellants, <br><br> v. <br><br> CITY OF EL CAJON et al., <br><br> Defendants and Appellants. | D076752 <br><br> (Super. Ct. No. 37-2017-00005331-CU-PO-CTL; consolidated with Super. Ct. No. 37-2018-00036420-CU-PO-CTL) |

APPEALS from a judgment of the Superior Court of San Diego County, Kenneth J. Medel, Judge.  Affirmed.

Cochran Firm, Brian T. Dunn; Gilleon Law Firm and James C. Mitchell for Plaintiffs and Appellants.

Daley & Heft, Lee H. Roistacher, Mitchell D. Dean and Heather E. Paradis for Defendants and Appellants.

City of El Cajon Police Officer Richard Gonsalves fatally shot Alfred Olango after Olango refused to take his hand out of his pocket and then pulled out a metal object, stood in a shooting stance, and pointed the object at Officer Gonsalves's head.  Although the object closely resembled a gun, it

turned out to be a vape device. Olango's sister, Lucy Olango (Lucy), witnessed this tragic event.[1]

Lucy and Olango's wife and daughter sued the City of El Cajon (City) and Officer Gonsalves. Olango's wife and daughter brought a wrongful death claim alleging negligence. Lucy filed a separate complaint asserting three causes of action: (1) negligent infliction of emotional distress; (2) negligence in retaining, supervising, and training Officer Gonsalves; and (3) breach of mandatory statutory duty by retaining Officer Gonsalves. The latter two claims were against only the City. The court sustained the City's demurrer on these two claims.

Thus, plaintiffs' consolidated case against Officer Gonsalves and the City went to a jury trial on negligence and negligent infliction of emotional distress theories. The parties agreed that to prevail on these theories, plaintiffs were required to prove Officer Gonsalves's use of deadly force was unreasonable under all the circumstances known to him at the time. (*Hayes v. County of San Diego* (2013) 57 Cal.4th 622, 629 (*Hayes*).)

At trial, the jury heard from eyewitnesses and saw videos of a portion of the incident, including the shooting. The main disagreement between the parties was whether Officer Gonsalves's actions were reasonable in light of the totality of the circumstances. Both sets of parties presented a police procedures expert. Plaintiffs' expert was not critical of Officer Gonsalves's decision to fire his weapon at the moment he did, but said his tactical decisions before the shooting were unreasonable and led to the deadly shooting. Defendants' expert said Officer Gonsalves's actions were

---

[1]    We identify Lucy Olango by her first name to avoid confusion with her brother who has the same last name.

2

reasonable and met professional standards before and at the point of the shooting.

After considering the evidence and arguments, the jury unanimously found plaintiffs did not meet their burden to prove Gonsalves was negligent, and the court entered judgment in defendants' favor.

On appeal, plaintiffs do not dispute that substantial evidence supported the jury's finding that Officer Gonsalves acted reasonably and was not negligent. But they contend the court erred by overruling their objections to certain testimony by two witnesses: (1) a defense toxicology expert who testified that Olango was under the influence of a toxic level of cocaine when the shooting occurred; and (2) a witness who observed Olango's conduct a few minutes before the shooting. We conclude the court acted within its discretion in admitting this evidence, and to the extent some portion of the bystander witness testimony should have been excluded, the outcome would have been the same and thus there is no basis to reverse the judgment.

Lucy also contends the court erred in sustaining the City's demurrer on her breach of mandatory duty and negligent training/retention claims. Based on the jury's finding that Officer Gonsalves was not negligent, Lucy could not have prevailed on these claims and thus her challenges to the demurrer ruling are unavailing.

Based on these conclusions, we do not reach defendants' cross-appeal as to whether a duty was owed to Lucy for negligent infliction of emotional distress based on her witnessing the shooting.

## FACTUAL SUMMARY

*Day of the Fatal Shooting*

In September 2017, at about 6:30 a.m., Olango's acquaintance, LL,[2] saw Olango at a convenience store buying coffee. She thought he appeared fine.

About 90 minutes later, at about 8:00 a.m., Olango arrived at Lucy's apartment while she was still in bed. He said hello and that he loved her. He was acting normal and seemed fine. Lucy then went back to bed for about 20 to 30 minutes. Olango frequently visited Lucy and sometimes stayed overnight.

At about 8:30 a.m., Lucy got up because she heard Olango pacing around the apartment, opening and closing doors. He was breathing hard and sniffling, and said he was scared. Lucy asked if he was sick or had taken drugs, but he denied both. Olango was also smoking cigarettes, although he knew Lucy was allergic and did not permit smoking in her apartment. Lucy opened the windows and then left her apartment for about 15 to 20 minutes to run an errand.

Although Lucy did not know at the time, Olango's very close friend had committed suicide a few days earlier, and the funeral was scheduled for that day. One day earlier, Olango had briefly stopped by his wife's house just to say he loved her and his daughter. Olango's wife thought he was "acting strange" and "weird" that day.

When Lucy got home from her errand, she saw Olango had closed the windows and blinds. Olango said he was scared because people were following him. Lucy told him he was safe and no one was following him.

---

[2] Under governing privacy rules, we refer to witnesses by their initials. (Cal. Rules of Court, rule 8.90.)

4

Olango was still sniffling and sweating profusely. Lucy had never seen him acting like that, and thought Olango had used some type of drug.

After several hours, at about 1 p.m., Lucy called 911 and told the operator her brother needed help and was acting mentally unstable. She said Olango was sweating profusely and she had never seen him behave like this before. She said he thought people were following him. She told the dispatcher that Olango was not armed.

When police officers did not initially respond to the call, Lucy became concerned because she needed to be at work by about 2:00 p.m. and did not want to leave Olango alone. Lucy worked as a medical assistant at a mental health facility.

At some point after her 911 call, Lucy realized Olango was no longer in the apartment. He had left his cell phone, and his car was still parked at her complex. At about 1:40 p.m., she got in her car to drive to work.

As she was driving, she saw Olango walking in traffic on a nearby street. She testified he looked "scared" and was moving "erratically." She was afraid he would get hit by a car because it is a "busy, busy, busy" road, and she told him to get out of the street. When he did not respond, Lucy again called 911, and then stopped her car and got out.

Lucy started walking with her brother or just behind him, pleading with him to get out of the street. He did not respond and continued to walk in traffic, looking behind him as if he thought someone was following him. Cars were honking at him, and it appeared to Lucy that he did not care whether he would be hit by a car. About 15 minutes later, Lucy again called 911, telling the operator that Olango was still acting erratically and was walking in the street and almost got hit by cars. She said she thought he

5

needed to be placed on a section 5150 mental health hold. (See Welf. & Inst. Code, § 5150.)

At trial, over plaintiffs' objections, the jury heard testimony from two other witnesses who also saw Olango walking in traffic: CC (a woman who was driving a car in the area) and LL (Olango's acquaintance who had seen him earlier that morning at the convenience store). Both witnesses thought Olango appeared out of control and was acting strangely. LL said Olango acted as if he was "out of his mind" and was "talking crazy," running back and forth in and out of the street. She thought he was on drugs. CC testified Olango was screaming and yelling with a "crazed" look in his "wide and bloodshot" eyes. She said she thought Olango had a gun and was concerned he might try to kill her or someone else.[3]

At about the same time that CC was observing Olango (about 2:05 p.m.), two responding police cars pulled into a nearby gas station, each with one officer in the vehicle: Officer Gonsalves and Officer Josh McDaniel. Officer McDaniel was the primary responding officer because the location was within his geographical sector of responsibility. The officers understood from dispatch that a man's sister had called because she believed the man was suffering from a mental illness or mental crisis and needed help, including a possible section 5150 hold. The officers were told to look for a Black male, walking in traffic and acting strangely.

Lucy saw the officers and ran over to them. She testified she first spoke with Officer Gonsalves and then spoke with Officer McDaniel. However, the officers testified she spoke only with Officer McDaniel, who had stepped out of his vehicle, and that Officer Gonsalves listened to the first part

---

[3] We detail CC's testimony and plaintiffs' objections to her testimony in the Discussion section, Part II.C.

6

of the conversation through his open window while remaining in his vehicle. Officer Gonsalves said he heard Lucy tell Officer McDaniel her brother was "not acting right." After Lucy pointed to the general area where she last saw Olango, Officer Gonsalves told Officer McDaniel he would go look for him. Officer Gonsalves testified he was concerned for Olango's safety: "[T]here [was] a potential for him to get hurt if he was walking in traffic. This is a very, very busy intersection . . . especially at that . . . time of the day . . . ."

While Officer Gonsalves was looking for Olango, Officer McDaniel continued to talk with Lucy. Lucy told Officer McDaniel that Olango was walking in and out of traffic, and he thought people were out to get him, and this behavior was not normal for Olango. Officer McDaniel asked Lucy if Olango was schizophrenic, but she denied this. She testified she said that Olango did not have any diagnosed mental condition, but she thought he was experiencing a mental crisis and needed help.

Within about five minutes, at about 2:09 p.m. Officer Gonsalves saw Olango walking in a nearby strip mall parking lot. After making eye contact with Olango, Officer Gonsalves stopped his car and then got out of the vehicle. Officer Gonsalves was initially about 40 to 50 feet away from Olango. The first portion of this encounter was not caught on videotape.

Officer Gonsalves testified that when he first got out of his car, he said something like, "Hey, buddy, . . . I need to talk to you." Officer Gonsalves wanted to keep the conversation "low key," understanding Olango had not been acting normal and would see he was in full police uniform and was driving a police car. At this point, Officer Gonsalves did not have his gun out or his hand on his gun.

Olango did not respond, and instead immediately put his right hand in his pocket and started walking backwards. Officer Gonsalves had noticed a

7

bulge in Olango's pocket before he put his hand in his pocket, and became concerned that Olango had a weapon in his pocket. Officer Gonsalves testified: "It was obvious that there was something else in his pocket besides his hand. In law enforcement you are trained at the very beginning of your career that you always have to account for people's hands because hands are what kill. So from the very first minute you step into the police academy that's what gets drilled into your head. So anybody that I contact, the very first thing that I do is look for their hands . . . ."

Officer Gonsalves testified that at that point he decided before he could speak further to Olango or conduct a mental health evaluation, he needed to make sure Olango did not have any weapons. Officer Gonsalves began asking Olango to take his hand out of his pocket. He did so in a normal and calm voice. Olango did not respond and began backing up and "walking erratically around the parking lot," while keeping his hand in his pocket. Because of Officer Gonsalves's concern that Olango might have a weapon, the officer removed his gun from its holster and held it in his left hand pointed downward against his leg.

Officer Gonsalves radioed his location, and calmly asked the dispatcher to " 'give me the air,' " which informs the dispatcher he had a potential dangerous situation and needed the dispatcher to block all other radio traffic on the frequency. In seeking to communicate the potentially dangerous situation, he also radioed that the person was noncompliant and that he has his hand in his pocket. He was attempting to indirectly communicate with responding officers, but did not want Olango to know he was calling for help because he was concerned this might make the situation worse.

Officer Gonsalves continued to ask Olango in a calm manner to take his hand out of his pocket, and did so on the radio to let the other officers know it

was "still a dangerous situation when you get here," but he did not want to "get on the radio in earshot of Olango and say something like, you guys need to hurry up and get here because he's still got his hand in his pocket and he's not taking it out." He thought it "was more subtle to just keep telling him to take his hand out of his pocket, but also allow other people to hear that happening in real time." He expected Officer McDaniel to arrive "in a matter of seconds" because he knew Officer McDaniel could hear his radio broadcasts.

Officer Gonsalves considered that maybe Olango was deaf or did not know English, so he demonstrated what he needed to do—take his hand out of his pocket. Olango again did not respond.

Officer Gonsalves saw that Olango was sweating heavily, taking deep breaths, continuously looking around to his left and right and behind him, and moving sideways back and forth. Based on his training, Officer Gonsalves believed that Olango was "deciding to fight or flee." Officer Gonsalves was aware there were numerous businesses and people in the area, and was concerned that if Olango was given the opportunity to run away, he could threaten bystanders' safety.

As Officer Gonsalves continued asking Olango to take his hand out of his pocket, Olango began walking closer to a nearby taco shop, and Officer Gonsalves followed him there. Officer Gonsalves decided to attempt to contain Olango in this place (pending the arrival of other officers) because Olango was now between a truck and a fence at a place where it would be difficult to run away.

Two videos captured the remaining portions of the incident: one from a camera on the taco shop showing about 44 seconds of the encounter without sound (Exhibit 27), and one from a cellphone with sound showing about 15

9

seconds before the shooting (Exhibit 28).  The jury viewed these videos and also saw numerous still images from Exhibit 28.

In one video, Officer Gonsalves is seen walking toward Olango with his gun down and mirroring Olango's movements as he walked side to side, keeping the same distance away from him.  At some point, right after Olango momentarily turned the top portion of his body away from him, Officer Gonsalves moved his gun from against his leg to a "compressed ready" position with the gun against his chest pointed outward while repeatedly telling Olango to remove his hand from his pocket.

As this was occurring, Officer McDaniel arrived and walked to Olango's side.  Officer McDaniel held out his Taser and moved closer to Olango. Officer Gonsalves then began pointing his gun straight out to the right of Olango.

At the same time, Lucy suddenly came behind Officer Gonsalves, and began yelling and screaming for Olango to put up his hands and take his hand out of his pocket.  Officer Gonsalves momentarily turned around and told her to "stay back" or "stand back" or "back off."  However, when Officer Gonsalves turned back toward Olango, he saw Olango had taken his right hand out of his pocket with a metal object, joined it together with his left hand, placed his arms together chest high, putting his body into a classic " 'shooter's stance,' " and pointed the metal object directly at Officer Gonsalves's head.



Both officers thought the metal object was a handgun. The object had a silver cylinder that looked to Officer McDaniel to be a barrel of a gun. Officer Gonsalves believed "a barrel of . . . a gun was pointed at [his] face." Officer Gonsalves thought he had made "a fatal mistake by taking [his] eyes off" Olango to respond to Lucy, and he "was going to pay for it with [his] life."

Officer Gonsalves ducked and then immediately fired his gun "because [he] thought [he] was about to get killed." Gonsalves fired four times in rapid succession, stopping when Olango fell and no longer appeared to pose a threat. The bullets hit Olango in the right arm, chest, and left shoulder. Officer McDaniel deployed his Taser at Olango at about the same time. He did not know if it was Officer Gonsalves or Olango shooting, or both of them.

Officer Gonsalves reported shots fired at 2:11 p.m. and requested medical care for Olango. The officers then saw the object that Olango had been holding was an 8-inch long vape device with a 3-inch long metal barrel.





When pointed, the metal barrel looks like the barrel of a gun.

Olango died from the gunshot wounds about 90 minutes later at 3:45 p.m. The total time between when Officer Gonsalves first encountered Olango until he fired the shots was about one and one-half minutes.

Lucy testified she had earlier told the officers that her brother did not have a weapon, and that she yelled "don't shoot" him and he has "nothing on him" when she was standing behind Officer Gonsalves seconds before the shooting. Both officers denied she said this or that they had been given this information from dispatch, but they testified it would not have changed their

approach or tactics because it is "unverifiable information." Officer Gonsalves testified that throughout his 25-year career he has been told "countless times" that someone does not have a weapon when this information turns out to be not true. Defendants' expert said that officers are trained to not rely on dispatch information regarding whether an individual is armed.

Officer Gonsalves testified he had no intention of threatening or shooting Olango to get him to remove his hand from his pocket, and acted only when he believed his own life was threatened. He said that during the brief encounter he did not consider going to his trunk to retrieve his bean bag shotgun because he was concerned he might lose sight of Olango and because carrying this weapon would have required the use of both hands.

Officer Gonsalves and Officer McDaniel testified they did not discuss a plan before Officer Gonsalves went to look for Olango because they did not know whether they would find him or what he would be doing if they found him. Officer McDaniel explained: "[W]e get calls like this every day, several a day, somebody is in some area behaving abnormally . . . . And quite frequently we go and look for them and we don't even find them. And . . . we [had] no idea what [Olango would be doing if we found him] . . . even [to] know . . . what a plan would be. [¶] There would be just any number of possibilities of things that could happen and there is no way we could have a discussion covering all those possibilities."

*Law Enforcement Experts*

Each set of parties presented a police procedures expert. Plaintiffs' expert, Roger Clark, a 27-year veteran of the Los Angeles County Sheriff's Department, testified that Officer Gonsalves acted unreasonably because he did not adhere to training standards applicable to dealing with persons with

13

mental illness or disabilities. He discussed Peace Officer Standards and Training (POST) and Learning Domain Number 37, which contain certification standards and relevant training guidelines.

Clark stated that when dealing with a mentally or emotionally disturbed individual, a police officer should engage in a particular sequence of events: (1) stabilize and contain the scene (ensure the safety of the individual and the officer); (2) decompression ("lower the anxieties" of the individual); (3) communicate in a calm and nonthreatening manner that will eliminate a panic (fight or flee) response; and (4) resolve the situation (instruction and obtain compliance). He also said that under the applicable training guidelines, the officer should first request backup, and the contact and cover officers should always work together in handling the situation. But he acknowledged these standards require an officer to *first* stabilize the scene to ensure there is nothing hazardous or dangerous, and *then* once the scene is stabilized, to reasonably accommodate the person's disability.

Based on these standards, Clark opined that Officer Gonsalves acted unreasonably mainly by: (1) starting to look for Olango without first staying to hear the entire interview with Lucy, particularly Lucy's claimed denial that Olango had a gun and Officer McDaniel's question about whether Olango was schizophrenic (which Lucy denied); (2) approaching Olango without first waiting for Officer McDaniel to be at the scene and without first putting together a tactical plan with Officer McDaniel; (3) failing to slow down events to preclude the need for a use of force; and (4) failing to retreat to a place of cover behind some nearby trees once he saw Olango with his hand in his pocket.

Clark opined that Officer Gonsalves's decision to approach Olango with his gun out of the holster might have increased Olango's anxiety level, and

14

his tactical decisions leading to the shooting were unreasonable because there were "obvious reasonable alternatives." But Clark acknowledged that officers are properly trained to use deadly force when the officer has the objective and reasonable belief that a person poses an immediate threat of death or serious bodily harm.

Defendants' expert, Scott Reitz, was a former law enforcement officer with the Los Angeles Police Department, who had extensive experience in training law enforcement officers on firearm tactics. He opined that Officer Gonsalves acted reasonably under the circumstances.

Reitz testified there is no strict protocol for a law enforcement officer dealing with a mentally impaired individual because every situation is unique, but he agreed with Clark the first step is always to stabilize the situation by making it safe. Reitz testified that after Olango put his hand in his pocket with a bulge at the start of the encounter, the scene was never stabilized or safe.

Reitz opined that Officer Gonsalves's decision to approach Olango before Officer McDaniel arrived was reasonable to assess the safety of the situation and to protect the public in this busy area where there were many bystanders. When asked about the possibility that Officer Gonsalves use nearby trees for cover and stay at a distance, Reitz testified this action may have been reasonable but the officer's decision to approach without utilizing the cover was "perfectly reasonable as well."

Reitz testified that Officer Gonsalves acted appropriately in using his body to mirror Olango's movements and to get Olango into an area of containment. He said Officer Gonsalves was "keeping a distance. He [was] continually communicating with Mr. Olango . . . he [was] very calm. He [was] not yelling. He [was] not pointing any weapon toward him. He [was] not

15

threatening him in any way, shape or form. [H]e [was] giving constant updates to dispatch for other officers who are in route to understand the situation before they [have] eyes on the problem . . . . [¶] So he's doing a remarkable job of not only containing, but attempting to get Mr. Olango to comply with his request to remove his hand."

Reitz said it was reasonable for Officer Gonsalves to have his gun out at low ready once Olango refused to remove his hand from his pocket, and that Officer Gonsalves's actions throughout the incident were "extremely prudent." He testified that Olango "took every [option] away the minute he drew that vape, assumed a combat stance, oriented the vape with the barrel, closely resembling the muzzle of a firearm, directly at Officer Gonsalves'[s] head and did so in an extremely rapid fashion." He said that "any reasonable officer on scene would have concluded they were about to be shot." He testified that when Officer Gonsalves saw Olango go into a shooting stance with a pointed object that looked like the barrel of a gun, Officer Gonsalves's "only option left . . . was deadly force."

*Cocaine Evidence*

A toxicology report of a blood draw about 30 minutes after the shooting (while Olango was still alive) showed Olango had a cocaine blood concentration level of .08 milligrams per liter and a benzoylecgonine (BZE) blood concentration level of 3.6 milligrams per liter.

Plaintiffs' expert testified the .08 milligram level was a relatively low amount of cocaine and, based solely on the laboratory report, it was not possible to determine Olango's cocaine blood level when the shooting occurred or whether Olango was under the influence of cocaine at that time.

Defendants' expert, Dr. David Geller, reached a different conclusion based on his review of the laboratory report and witness deposition

16

testimony. Over plaintiffs' objections, he opined that Olango had taken a "massive amount" of cocaine earlier that day, and "to an overwhelming degree of medical probability" the cocaine continued to affect his behavior during the minutes and seconds before he was shot. We discuss Dr. Geller's opinion in more detail in Discussion section Part II.A.

*Verdict*

After closing arguments and jury instructions, the court gave the jury a special verdict form. Although the verdict form is not in the record, the record reflects the first question was whether plaintiffs proved Officer Gonsalves was negligent. After a brief deliberation, the jury answered no, that plaintiffs did not prove Officer Gonsalves was negligent. Based on this answer, the court entered judgment in defendants' favor.

## DISCUSSION

Plaintiffs contend the court made two evidentiary errors at trial: (1) admitting the testimony of Dr. Geller, defendants' toxicology expert; and (2) admitting the testimony of CC, the witness who saw Olango walking in traffic near her car minutes before the shooting.

Lucy also contends the court erred in sustaining the City's demurrer on her claims involving the City's negligence and/or breach of mandatory duty pertaining to its retention, training, and/or supervision of Officer Gonsalves.

We first summarize the negligence standards applicable to a challenged police shooting because those standards are the touchstone for evaluating relevancy and prejudicial error issues with respect to the evidentiary challenges. We next evaluate the two evidentiary contentions. We then address Lucy's contentions concerning the court's demurrer ruling.

17

## I. Applicable Negligence Law

Under California negligence law, " 'peace officers have a duty to act reasonably when using deadly force' and . . . '[t]he reasonableness of an officer's conduct is determined in light of the totality of circumstances,' *including 'the tactical conduct and decisions leading up to the use of deadly force.' "* (*Koussaya v. City of Stockton* (2020) 54 Cal.App.5th 909, 934 (*Koussaya*), italics added; *Hayes*, *supra*, 57 Cal.4th at pp. 626, 629.) Thus, "preshooting circumstances might show that an otherwise reasonable use of deadly force was in fact unreasonable." (*Hayes,* at p. 630; *Koussaya,* at p. 935; see also Pen. Code, § 835a.)[4]

If an officer is aware an individual is mentally or emotionally impaired, the officer should consider this fact in formulating an appropriate response. (See *Deorle v. Rutherford* (9th Cir. 2001) 272 F.3d 1272, 1283.) But " '[t]he "reasonableness" of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." (*Hayes, supra,* 57 Cal.4th at p. 632.) We " ' " 'must never allow the theoretical, sanitized world of our imagination to replace the dangerous and complex world that [police officers] face every day. What constitutes "reasonable" action may seem quite different to someone facing a possible assailant than to someone analyzing the question at leisure.' [Citation.]" [Citation.] Placing the burden of proof on the plaintiff to establish that an officer's use of force was unreasonable "gives the police appropriate maneuvering room in which to make such judgments free from

---

4    At the time of the 2018 trial, Penal Code section 835a stated police officers may use reasonable force "to effect [an] arrest, to prevent escape or to overcome resistance." Effective January 1, 2020, this code section was amended to more specifically define the circumstances under which police officers may use deadly force.

the need to justify every action in a court of law." [Citation.]' " (*Koussaya, supra,* 54 Cal.App.5th at p. 936; *Brown v. Ransweiler* (2009) 171 Cal.App.4th 516, 528.)  Consistent with these principles and the recognition that law enforcement officers must often make split-second decisions, law enforcement personnel have "a degree of discretion as to how they choose to address a particular situation." (*Hayes,* at p. 632; *Koussaya,* at p. 936.)

Further, to the extent the injured or deceased party's negligent conduct was a substantial factor in bringing about his or her injuries or death arising from an officer's use of force, the comparative fault doctrine reduces the defendant's liability for any damages.  (*Atkins v. Strayhorn* (1990) 223 Cal.App.3d 1380, 1395 ["[I]n wrongful death actions, the fault of the decedent is attributable to the surviving heirs whose recovery must be offset by the same percentage"]; see *Horwich v. Superior Court* (1999) 21 Cal.4th 272, 285; see also *Munoz v. City of Union City* (2009) 173 Cal.App.4th 199, 201; *Munoz v. City of Union City* (2007) 148 Cal.App.4th 173, 184-186; *Willis v. City of Fresno* (E.D.Cal. Apr. 14, 2014, No. 1:09-CV-01766-BAM) 2014 WL 1419239; at \*12-\*13 (*Willis*).)

Both experts testified consistent with these concepts, and the parties agree the court properly instructed the jury on these principles.  (See CACI Nos. 440, 407.)  Plaintiffs do not challenge the sufficiency of the evidence to support the jury's verdict in the case.

## II.  Evidentiary Contentions

### A.  Law Governing Evidentiary Rulings

Only relevant evidence is admissible. (Evid. Code, § 350.)[5]  Relevant evidence is evidence having "any tendency in reason to prove or disprove any

---

5      In Part II of this opinion, statutory references are to the Evidence Code.

disputed fact that is of consequence to the determination of the action."
(§ 210.)

Under section 352, "[a] trial court may exclude otherwise relevant evidence when its probative value is substantially outweighed by concerns of undue prejudice, confusion, or consumption of time." (*People v. Scott* (2011) 52 Cal.4th 452, 490.) "Evidence is substantially more prejudicial than probative [citation] if . . . it poses an intolerable 'risk to the fairness of the proceedings or the reliability of the outcome' [citation]." (*People v. Waidla* (2000) 22 Cal.4th 690, 724.) "[E]vidence [is] unduly prejudicial when it is of such nature as to inflame the emotions of the jury, motivating them to use the information, not to logically evaluate the point upon which it is relevant, but to reward or punish one side because of the jurors' emotional reaction." (*Scott*, at p. 491.)

Absent a legal issue, a court has broad discretion in determining whether evidence is relevant and admissible, and whether evidence should be excluded under section 352. (*Zhou v. Unisource Worldwide* (2007) 157 Cal.App.4th 1471, 1476; *Geffcken v. D'Andrea* (2006) 137 Cal.App.4th 1298, 1307.) We must affirm these rulings unless the court abused this discretion. (*Ibid.*) A trial court abuses its discretion if, "in light of the applicable law and considering all of the relevant circumstances, the court's decision exceeds the bounds of reason." (*Coyne v. De Leo* (2018) 26 Cal.App.5th 801, 814.) If error is found, it "is grounds for reversing a judgment only if the party appealing demonstrates a 'miscarriage of justice'—that is, that a different result would have been probable if the error had not occurred." (*Zhou*, at p. 1480; *San Diego Gas & Electric Co. v. Schmidt* (2014) 228 Cal.App.4th 1280, 1301-1302.)

## B. Challenges to Dr. Geller's Testimony

At trial, plaintiffs moved to exclude all evidence of Olango's cocaine use on the day of the shooting as irrelevant, and to preclude defendants' expert, Dr. Geller, from offering opinions on this subject.

On appeal, plaintiffs do not challenge the court's ruling that Olango's cocaine use on the day of the shooting was relevant to the disputed issues at trial. But they argue the court erred in permitting Dr. Geller to testify because (1) his opinions were based on conjecture and speculation; and (2) his testimony "created the danger of undue prejudice" and thus should have been excluded under section 352. We determine the court acted within its discretion in admitting Dr. Geller's testimony.

### 1. Relevant Background Information

At his deposition, Dr. Geller testified "to an overwhelming degree of medical probability," Olango's conduct before the shooting resulted from his use of a "massive amount of cocaine" earlier that day.

In their motion in limine, plaintiffs moved to exclude Dr. Geller's opinion on foundation grounds because Dr. Geller admitted at his deposition he had no scientific basis to opine on *when* Olango ingested the cocaine or the "level of cocaine in Olango's system at the time of the incident." Plaintiffs also argued the cocaine evidence was irrelevant because Officer Gonsalves did not know Olango had used drugs that day. Plaintiffs additionally maintained the evidence should be excluded under section 352 because the jurors would be improperly influenced by Olango's drug use in evaluating Officer Gonsalves's actions and decide the case based solely on the jurors' "dislike" for drug users.

Defendants opposed the motion. On plaintiffs' speculation/foundation arguments, defendants proffered Dr. Geller's expert report and deposition

21

testimony in which he explained that although he could not determine Olango's cocaine blood concentration level when the shooting occurred, this determination was not necessary to the issue whether Olango was under the influence of cocaine at that time. Dr. Geller said he could make this determination based on (1) Olango's BZE blood concentration level, which studies show follows peak blood concentrations of cocaine by several hours; (2) the fact the clinical effect on the brain may persist for many hours after peak blood concentrations, particularly in a cocaine overdose situation; and (3) his review of witness deposition testimony reflecting observations of Olango's appearance and actions that strongly correlated with toxic-cocaine symptoms.

On the relevance issue, defendants argued Olango's cocaine intoxication at the time of the shooting was probative on several grounds, including to (1) explain Olango's unusual behavior and corroborate the officers' observations of his erratic behavior; and (2) support defendants' claims that Olango bore responsibility for his death under the comparative negligence doctrine.

At the in limine hearing, plaintiffs' counsel reasserted their written arguments, and also argued Dr. Geller should not be permitted to discuss his reliance on witness observations because that is case-specific information inadmissible under *People v. Sanchez* (2016) 63 Cal.4th 665, 684 (*Sanchez*). The court denied the motion, noting the "evidence of cocaine use is relevant to the overall picture" and indicating its agreement with defense counsel that Dr. Geller's opinions were supported by accepted scientific analysis. The court acknowledged "there are elements of prejudice" when drug use evidence is presented, "but unfortunately, the relevance of the information far outweighs the potential undue prejudicial effect." As to the *Sanchez*

argument, the court stated it would be "vigilant for the *Sanchez* issue if the issue would arise."

## 2. Dr. Geller's Trial Testimony

In his trial testimony, Dr. Geller opined that Olango had "consumed an inordinately large" or "massive amount" of cocaine on the day that he was shot, enough to cause "severe poisoning," and that the cocaine significantly affected Olango's behavior before and during his confrontation with Officer Gonsalves.

Dr. Geller testified he based this conclusion on a combination of the laboratory results of Olango's 2:43 p.m. blood draw and a review of Olango's behaviors reflected in witness deposition testimony. Essentially, his opinion was that because Olango had taken such a "massive" cocaine amount in the morning, the effects of this toxic amount of cocaine on his nervous system and brain continued throughout the afternoon, including when he was shot.

To explain his opinion about the large amount of cocaine taken earlier, Dr. Geller testified about Olango's 3.6 milligrams per liter BZE blood concentration level, which he said would have mirrored the level of cocaine at an earlier time. Dr. Geller said that BZE is a downstream cocaine metabolite produced in the human body following cocaine use. He said that cocaine is present in the blood for a relatively short time, but cocaine is transformed into BZE, which is a marker for previous cocaine use. Dr. Geller said that, "you can look backward from a [BZE] concentration, at a given point in time, to how much cocaine would have had to be consumed in order to get that concentration of BZE in the blood." Relying on peer-reviewed scientific studies, Dr. Geller said the peak concentration for cocaine occurs relatively rapidly within 10 or 15 minutes. "But [in these studies] the concentration for [BZE] typically occurred three to four hours after administration [of the

23

cocaine]." Additionally, "the peak concentration of [BZE] . . . very closely mirrored what the peak cocaine concentration was. They were within 10 percent of each other . . . . [¶] So what this allows me to say is that in order to get a specific [BZE] concentration in the blood, you had to have consumed enough cocaine to have . . . a very similar concentration of cocaine at some point three or four hours before."

Based on this information, Dr. Geller opined "to a very high degree of medical probability that Mr. Olango would have had to consume an amount of cocaine, on the day that he died[,] that would have been enough to cause cocaine concentration of at least 3.6 milligrams per liter." And he testified that 3.6 milligrams is an "extraordinarily high" cocaine amount.

Dr. Geller then explained that when a person takes such a large amount of cocaine, the cocaine continues to negatively affect someone's brain and cause "toxic carnage" for "quite a number of hours" after the peak blood concentrations start to decline. When asked whether he had an opinion as to when Olango's "peak blood concentration of cocaine was," Dr. Geller responded, "I have no real way of telling you that exactly[,]" but his "educated guess" was "four to five hours prior to [the blood] sample being drawn." He based this opinion on (1) Olango's BZE and cocaine blood concentration levels at 2:43 p.m.; (2) the deposition testimony of witness LL and Lucy showing Olango was acting his normal self at about 6:30 a.m. and about 8:00 a.m.; and (3) Lucy's deposition testimony that by about 8:30 or 9:00 a.m., he was not the same person (he was sweating, and became fearful, paranoid, and hyperactive).

As to Lucy's deposition testimony, Dr. Geller said her description of Olango as "profusely sweating" and acting in an agitated manner reflected a person who was in "deep trouble" and was likely "acutely poisoned by the

24

drug . . . ." He testified that after reviewing the videotape and reading the witness deposition testimony, and particularly witness CC's testimony, he determined Olango's behaviors and appearance on the afternoon of the shooting were consistent with someone who is under a toxic level of cocaine, even if the cocaine was ingested several hours earlier.

### 3. Analysis

On appeal, plaintiffs argue Dr. Geller's opinions should have been excluded because his opinions were based on conjecture and speculation.

"[E]ven when [a] witness qualifies as an expert, he or she does not possess a carte blanche to express any opinion within the area of expertise." (*Jennings v. Palomar Pomerado Health Systems, Inc.* (2003) 114 Cal.App.4th 1108, 1117.) The opinion must be based on facts and reasoned analysis. "[T]he trial court acts as a gatekeeper to exclude expert opinion testimony that is (1) based on matter of a type on which an expert may not reasonably rely, (2) based on reasons unsupported by the material on which the expert relies, or (3) speculative." (*Sargon Enterprises, Inc. v. University of Southern California* (2012) 55 Cal.4th 747, 771-772 (*Sargon*); see §§ 801, subd. (b), 802.)

"But courts must also be cautious in excluding expert testimony. The trial court's gatekeeping role does not involve choosing between competing expert opinions." (*Sargon, supra,* 55 Cal.4th at p. 772.) "The trial court's preliminary determination whether the expert opinion is founded on sound logic is not a decision on its persuasiveness. Rather, the court must simply determine whether the matter relied on can provide a reasonable basis for the opinion or whether that opinion is based on a leap of logic or conjecture." (*Ibid*.) We review a ruling admitting expert testimony for abuse of discretion. (*Id*. at p. 773.)

25

The trial court did not abuse its discretion. Dr. Geller's opinion that Olango had ingested a "massive amount" of cocaine earlier in the day was grounded on the laboratory reports showing a .08 milligrams per liter cocaine concentration level and a 3.6 milligrams per liter BZE blood concentration level when Olango's blood was drawn at 2:43 p.m. He cited three scientific studies showing that the BZE cocaine metabolite mirrors the amount of cocaine taken several hours earlier. Dr. Geller also explained that when a person has taken this amount of cocaine, the toxic effects on his behavior can last several hours. Finally, Dr. Geller relied on the many witnesses who observed Olango from about 1:00 p.m. to the time of the shooting (2:11 p.m.) (e.g., Lucy, Officer Gonsalves, and witnesses CC and LL) to conclude Olango was suffering from cocaine intoxication or cocaine poisoning symptoms (heavy sweating, wide-eyed staring, paranoia, agitation, hyperactivity, inability to respond to questions or instructions, poor judgment).

Plaintiffs' main appellate argument is that Dr. Geller's opinions lacked foundation because he admitted he could not make any determinations about Olango's cocaine usage based only on the .08 blood concentration level reflected in the 2:43 p.m. blood draw; admitted he could not determine Olango's *cocaine blood concentration level* during Olango's encounter with law enforcement; and said he could give only "an educated guess" as to the precise time of Olango's peak cocaine blood concentration level. Based on these admissions, plaintiffs argue that Dr. Geller's opinions reflected only "speculation" and "guesswork."

The record does not support this argument. Dr. Geller made clear his conclusion that Olango was under the influence of cocaine when he was shot was not based on a conclusion about the cocaine blood concentration level at the time of the shooting (which he admitted he could not determine), but

26

instead was based on the BZE metabolite level in his blood draw (particularly as compared with the cocaine blood concentration level in the same blood draw), as well as his knowledge that the effects of ingesting a toxic amount of cocaine can continue for several hours and on witness observations of Olango's appearance and behavior. Dr. Geller testified "[t]he fact that the cocaine concentration was relatively low at the time of [the blood draw] does not in any way mean that Mr. Olango was not severely poisoned from cocaine at the time that he was shot." The court did not abuse its discretion in finding Dr. Geller's opinions were based on sound logic and reasoned scientific analysis.

Plaintiffs alternatively argue the court erred in denying their section 352 motion to exclude all of the cocaine evidence because its prejudicial impact greatly outweighed its probative value. In support, plaintiffs do not suggest that Olango's cocaine intoxication was not relevant to the disputed issues.[6] They instead argue the evidence had only slight probative value *because* "Geller was just guessing" at Olango's cocaine blood concentration level. However, we have rejected this contention, explaining Dr. Geller's opinions were based on reasoned analysis. Although the jury was entitled to reject Dr. Geller's opinions and instead to credit plaintiffs' expert, there is no basis to conclude Dr. Geller's opinions were not probative on the question of Olango's cocaine intoxication.

As to prejudice, plaintiffs argue the words used by Dr. Geller to describe the amount of cocaine taken by Olango ("toxic, inordinate, cocaine intoxication, acutely poisoned . . . , and drug poisoning") "inflame[d] the

_____

6     We discuss some of these relevancy grounds in addressing plaintiffs' challenges to CC's testimony.

27

emotions of the jury and cause[d] them to prejudge the plaintiffs' case based on [Olango's] use of cocaine . . . ."

The record is unclear whether plaintiffs asserted this specific objection in the trial proceedings. But even assuming they did, there was no abuse of discretion. Dr. Geller's opinions about the amount of cocaine taken by Olango were necessary to explain why he would have been still suffering from cocaine intoxication hours after he ingested the drug. Dr. Geller explained his opinions in a straightforward manner and discussed the scientific basis for these opinions. There is no reasonable likelihood the words he used to describe the cocaine amount likely ingested by Olango would have influenced the jurors to make decisions on emotions rather than the facts.

## C. Challenges to CC's Testimony

### 1. Background

Plaintiffs moved in limine to exclude the testimony of 13 bystander witnesses who saw Olango while he was walking in traffic before the officers arrived that day. Plaintiffs said these witnesses described Olango as "acting strangely and erratically"; "seemed upset and bothered"; "looked suspicious"; "jumped" in front of cars; was acting "very odd" and "peculiar"; looked like he "was trying to get hit by cars"; looked "menacing"; told someone to " 'get out of my face' "; looked like he was going to hit someone; was "tensing up" and "posturing"; appeared to be angry; and "was . . . making 'jerky motions' like he was on [drugs]."

Of particular relevance here, plaintiffs said that one of the witnesses, CC, testified in her deposition about Olango's demeanor as follows:

> "Mr. Olango crossed through traffic, almost walked into
> [her] car, was yelling and screaming, and had his hands in
> his pockets; . . . Mr. Olango was sweating profusely, and
> had wide, bloodshot eyes and a 'look of terror' on his
> face; . . . Mr. Olango was acting 'very strangely,' was 'out of

28

control,' was 'not well,' and appeared to be 'absolutely crazed' and 'dangerous'; . . . Mr. Olango looked like he was on drugs; . . . [CC believed] Mr. Olango was going to take her car, shoot her, kill her or someone else, or hurt someone; . . . [CC believed] that Mr. Olango had a gun; . . . [CC] was afraid of Mr. Olango, and that Mr. Olango was the 'scariest man'; and testimony concerning the nightmares that [CC] claims to have had a result of witnessing Mr. Olango's behavior and demeanor . . . ."

In moving to exclude these 13 witnesses, plaintiffs argued their observations were not relevant because they were not reported to, or otherwise known by, Officer Gonsalves before the shooting. They alternatively argued the evidence should be excluded under section 352 because "there is a significant risk that the jury will improperly rely on those . . . inflammatory and prejudicial characterizations . . . in determining whether Officer Gonsalves was justified in shooting Mr. Olango." Plaintiffs also argued this testimony would "result in the unnecessary and unwarranted consumption of time."

Defendants countered that the testimony was strongly relevant to (1) corroborate Officer Gonsalves's perceptions when he encountered Olango; (2) support that Olango ingested cocaine that day; (3) show Olango may have been planning a "suicide by cop"; and (4) support defendants' claim that Olango's own negligence contributed to his death. Defendants also maintained the evidence was necessary because Dr. Geller relied on several of the witnesses' observations to formulate his opinions in the case. Citing *Sanchez, supra,* 63 Cal.4th 665, defendants' counsel said that without the witness testimony, Dr. Geller may be prohibited from providing his opinions reached based on the witness statements.

At the in limine hearing, the court indicated its intent to deny the motion. The court agreed with plaintiffs that the evidence was not relevant

to Officer Gonsalves's assessment of the situation if the witness observations were not reported to him before the shooting. But the court found the evidence would be relevant on other issues, including to provide a complete picture of the events to corroborate the officer's testimony and on comparative negligence issues. The court said it trusted that the jury would "be smart enough" to "segregate" the information Officer Gonsalves knew and did not know before the shooting, and counsel could discuss this issue during arguments. But the court said it was "not inclined just to blanket-exclude" this evidence unless it was "unduly confusing."

Plaintiffs' counsel responded that if the witness observations are "hours and hours attenuated in time," the evidence could not be relevant to contributory negligence or anything else. The court replied that if the events did occur "very close in time" they would be strongly relevant to corroborate the officer's observations and to rebut testimony that Olango was merely suffering from mental illness and was not a threat to anyone, "kind of like . . . [in] [t]he movie Rain Man."

The court ultimately denied the motion, but said it was "sensitive to cumulative type of evidence. So I'd like you to make your best strategic efforts to eliminate the number of those types of witnesses."

Defendants then decided they would present the testimony of only two bystander witnesses who saw Olango walking in the street before the officers arrived: witness CC and Olango's acquaintance LL (who had also seen him earlier that morning). Defendants (with plaintiffs' agreement) presented both witnesses' testimony through their videotaped depositions.

Before the jury was shown CC's deposition video, plaintiffs' counsel asked the court to reconsider its decision to allow all of CC's proffered testimony: "I know you have ruled on this but I want to make one last plea

30

for mercy on . . . [CC's] deposition and the part where she says, I thought I was going to get killed. I got to tell you . . . there is no way, based upon what she says, that this is a reasonable opinion under the circumstances. And that is about as inflammatory as you can get. And it just seems to me that that part of it ought to be out. This is just feeding into this 20/20 hindsight thing." Plaintiffs' other counsel also reasserted his earlier objections that the evidence was not relevant because CC's observations were not known to Officer Gonsalves before the shooting.

After the court overruled these objections, the selected portions of the deposition video was shown to the jurors, and a transcript of this testimony is in the record.

In her testimony, CC, a high school guidance counselor, said on the day of the shooting she was driving to her hair appointment. At about 2:02 or 2:05 p.m. (less than five minutes before Officer Gonsalves first encountered Olango) she saw Olango "coming in the traffic and he was acting very strangely, yelling at traffic, out of control . . . . Cars were honking at him and he was coming for me—he was coming for my car and I will never forget his eyes. He was crazed and he had his hand in his pocket and I thought he was going to shoot me. He came at my door and I thought he was going to take my car or kill me." She then drove to her hair appointment. She admitted she saw him only for "seconds."

CC was then asked to elaborate on what she saw. She responded, "His eyes were wide, bloodshot. He was screaming and he had a look of terror . . . and I thought he was going to kill someone. I was scared. I still have nightmares." When asked again what Olango was doing when she saw him, she said, "[H]e had erratic behavior. He was swerving in and out. He

31

was screaming.  He was yelling and when he approached me, he had his hand in his pocket and he was yelling and I . . . was afraid for my life."

She testified she thought he had a gun in his pocket (but never saw a gun or a bulge in the pocket) because of "[t]he way he was holding" his hand in his pocket.  When asked again why she thought he had a weapon, she replied, "I believe that he was not well.  [H]e was walking into traffic.  [H]e was crazed, with those eyes.  I was very concerned for the man and he was not well."

When she was asked for her definition of the word "crazed," she said, "somebody that is not well at that moment.  [M]y goal in life is to help people and if I could have helped that man, I would have."  She said she did not know anything about his history, but "the erratic behavior I witnessed, it just didn't seem that he . . . was well at that moment.  It wasn't normal behavior . . . I suppose that's my opinion."  She said he "scared" her and was "screaming at things that weren't there . . . walking in and out of traffic."  She said she made eye contact with him, and it was "absolutely horrific."  When asked how tall he was, she said her "guess" was "[s]ix foot" and that he weighed about "200 pounds."  When asked whether he appeared to be "dangerous to you," CC responded, "He did.  Again, I feel that he was not well."

She testified that minutes after arriving at her hair appointment, she heard about the police shooting on the radio.  CC did not call the police until the next day.  She said her secretary is married to a detective with the City's police department.

After the video was shown and before closing arguments, the court (outside the jury's presence) put on the record its rulings as to the parties' specific relevance and section 352 objections to various portions of CC's

deposition testimony. The court overruled each of the objections asserted by both plaintiffs and defendants.

In explaining its rulings, the court commented that it believed it was particularly fair and appropriate to admit all of CC's testimony because Lucy was permitted (over defense objections) to testify at length as to her observations and opinions about her brother's conduct earlier that day, including in her statements to 911 operators, even though many of these statements were not known to Officer Gonsalves. The court said CC's "contrary view" would provide the jury with a more complete picture of the events preceding the shooting, and would be "relevant and corroborative." The court also said it found CC's testimony to be particularly "germane" because CC's observations were so similar to Dr. Geller's description of "what it looks like to be on cocaine."[7]

The next day, the court added that it found the testimony of Dr. Geller, CC, and LL additionally relevant on causation issues. The court noted that plaintiffs were required to prove that Officer Gonsalves's alleged negligence in failing to select an "alternate means" of approaching and detaining Olango "*caused*" his death, and the testimony about Olango's "crazed behavior" and the "inordinate amount of cocaine in his system" was relevant to "whether those alternate means . . . would have had any effect whatsoever on him . . . ." (Italics added.)

---

[7] Regarding CC's reference to nightmares, plaintiffs' counsel noted this statement had not been designated and had been inadvertently included. With each counsel's agreement, the court said it would strike this testimony and tell the jury not to consider it. The appellate record does not show the court gave this instruction, but it may have done so during an unreported portion of the trial. Plaintiffs do not suggest error in this regard.

## 2. Plaintiffs' Appellate Challenges

### a. Relevancy

Plaintiffs contend CC's testimony was irrelevant because her observations were not known to Officer Gonsalves before the shooting.

When analyzing the objective reasonableness of an officer's conduct for a negligence claim, a factfinder can consider only the circumstances of which the officer was aware when he used the deadly force. (*Hayes v. County of San Diego* (9th Cir. 2013) 736 F.3d 1223, 1232-1233 [applying California negligence law]; *Boyd v. City and County of San Francisco* (9th Cir. 2009) 576 F.3d 938, 943-944 (*Boyd*); *Willis, supra,* 2014 WL 1419239 at *21; see also *Hayes, supra,* 57 Cal.4th at p. 632*; Koussaya, supra,* 54 Cal.App.5th at p. 935.) Defendants' law enforcement expert testified he agreed with this principle.

But the evidence of a shooting victim's prior conduct unknown to the officer can be admissible if it is relevant on another ground. (*Boyd, supra,* 576 F.3d at pp. 943-945; see *Willis, supra,* 2014 WL 1419239, at *21-*22.) Thus, if there is a factual dispute as to what occurred at the time, evidence that the defendant engaged in similar behavior before the incident can be relevant to support, corroborate, or explain the officer's version of the events. (See *Boyd*, at p. 944; *Estate of Casillas v. City of Fresno* (E.D.Cal., Feb. 13, 2019, No. 1:16-CV-1042 AWI-SAB) 2019 WL 586747, at *4; *Willis,* at pp. *21-*22.) Likewise, the fact that a police shooting victim was intoxicated or under the influence of drugs may be relevant to corroborate the officer's version of how the individual acted before the shooting and/or can be probative on causation and comparative fault issues. (See *Willis*, at pp. *21-*22; see also *Woods v. August* (N.D.Cal., Mar. 14, 2019, No. 3:15-cv-05666-WHO) 2019 WL 8105898, at *3 [post-mortem drug tests and toxicology

34

reports admitted because they tended to "make more probable defendants' assertions that [the decedent] was behaving erratically and appeared to be under the influence"]; *Turner v. County of Kern* (E.D.Cal., Feb. 13, 2014, No. 1:11-CV-1366 AWI SKO) 2014 WL 560834, at *2-*3; *T.D.W. v. Riverside County* (C.D.Cal., Mar. 11, 2010, No. CV 08-232 CAS (JWJX)) 2010 WL 1006618, at *3.)[8]

In this case, CC's testimony was relevant on several grounds even though her specific observations were not known to Officer Gonsalves.

First, CC's testimony was relevant to support Dr. Geller's conclusions that Olango was under a toxic influence of cocaine at the time of the shooting. As discussed, Dr. Geller relied on CC's testimony in reaching his opinions on the level of Olango's cocaine intoxication at the time of the shooting, and under *Sanchez,* defendants were required to present this foundational testimony so they could properly elicit Dr. Geller's opinions. (*Sanchez, supra,* 63 Cal.4th at p. 684.) On appeal plaintiffs have not challenged the relevancy of the cocaine intoxication evidence, and we have rejected plaintiffs' foundation/speculation/prejudice challenges.

Second, CC's testimony was relevant to explain the nature of Olango's actions when Officer Gonsalves first approached him, matters that were subject to dispute at trial. The first portion of the encounter between Olango and Officer Gonsalves was not captured on videotape, and Officer Gonsalves testified that at the very beginning he became highly concerned when he saw a bulge in Olango's pocket and Olango would not remove his hand. Minutes before this occurred, CC observed Olango to be acting in an erratic and

---

[8]    If requested, the court may give a limiting instruction that the prior-conduct evidence is relevant only for specified purposes, but plaintiffs here did not request this instruction.

menacing manner, and she saw he did not appear to be well and appeared to her to be dangerous. These observations were probative to explain and corroborate Olango's condition when Officer Gonsalves first saw him and place into context Officer Gonsalves's concerns relating to this condition.

Third, as the court pointed out, the jury heard Lucy's testimony about her opinion that Olango appeared mainly to be scared and heard Lucy's many statements to 911 dispatch that were not communicated to Officer Gonsalves. Thus, CC's testimony was relevant to balance this testimony and provide the jury with a more complete picture of the events, enabling the jury to understand the different perspectives of the witnesses and to select the version of the facts it found to be most accurate.

Fourth, as the court also pointed out and as with the cocaine evidence, CC's testimony was relevant to support defendants' claims on causation, including to show that Olango's behavior would have been the same even if Officer Gonsalves had employed different tactics and/or that Olango bore at least some responsibility for his own death under the comparative negligence doctrine.

The court did not abuse its discretion in finding witness CC's observations were relevant to the disputed issues at trial.

### b. Opinion Testimony and Section 352

Plaintiffs alternatively argue the court erred in admitting the portions of CC's testimony reflecting her opinions that (1) " 'I thought he was going to shoot me' . . . I thought he was going to take my car or kill me' "; (2) " 'I thought he was going to kill someone' " and " 'I thought I was going to get carjacked or killed' "; (3) I was " 'afraid for my life' "; and (4) "[I] thought [he had] a gun." Plaintiffs argue this testimony constituted inadmissible lay

36

opinion testimony and/or the court should have excluded this "highly inflammatory" evidence under section 352.

A court has broad discretion to admit a lay witness's testimony about his or her opinion "if it is rationally based on the witness's perception and helpful to a clear understanding of the witness's testimony." (*People v. Leon* (2015) 61 Cal.4th 569, 601; see also § 800.) The court's exercise of discretion under this rule was appropriate. CC was testifying to what she perceived, and her references to her concerns for her safety and her opinions that Olango appeared to be dangerous were helpful to explain and place into context her specific observations and to assist in communicating the full extent of her memories of that day.

The more difficult question is whether the court should have excluded these statements under section 352. Although CC's testimony about her observations of Olango a few minutes before the officer encountered him (e.g., that he was walking erratically, had his hand in his pocket, looked "crazed") had strong probative value, her additional opinions that she believed he posed a danger *to her* and might "*kill*" her had less relevance to the disputed issues, particularly because of the highly subjective nature of these opinions. Likewise, CC's statements that she thought Olango was going to "kill" or "hurt" her and believed he had a gun had a greater potential to trigger an emotional response from the jury as compared with her pure factual descriptions of Olango's conduct.

On this record, it would have been reasonable under section 352 for the court to exclude these portions of CC's testimony. But the test is not whether a court could have ruled this way, whether we would have done so, or whether we think this would have been the more prudent approach. Rather, to reverse we must find the court " ' "exercised its discretion in an arbitrary,

37

capricious, or patently absurd manner." ' " (*People v. Nieves* (2021) 11 Cal.5th 404, 472.)

After a careful review of the record, we are not convinced the trial court's ruling met this standard. The trial judge—who was the closest to the action and had the advantage of observing counsel, the parties, the jurors, and the witnesses—was uniquely equipped to make the difficult call as to whether certain relevant evidence would affect the jury's decision making on an improper ground. The record makes clear the trial judge carefully and repeatedly considered plaintiffs' challenges to CC's testimony. He observed the jurors and was able to assess their ability to accept nuances in the relevancy of evidence and how certain testimony was likely to be received. The court expressly weighed and considered the probative value of the evidence, the potential for prejudice, all of the other evidence as to Olango's conduct that day, and the importance of providing the jury with the most complete picture of the witnesses' observations, including CC's own views and biases. On the last point, CC's statements about her fear for her own safety had the potential to bolster plaintiffs' arguments that CC was biased and had a faulty memory of the events.

Moreover, in the same sentences in which she was asserting she thought Olango was dangerous and might shoot or kill her, CC also repeatedly stated it was obvious to her that Olango was not well and needed help. Although she did not specifically state she thought Olango was suffering from mental health problems, this was the clear implication of her testimony. This testimony supported plaintiffs' theory that Officer Gonsalves should have backed off, rather than walked towards Olango, because it was obvious he was having acute mental problems.

In reviewing the entire record, the court's determination to permit all of CC's testimony was not so arbitrary or capricious that it constituted an abuse of discretion under section 352.

### c. Plaintiffs Did Not Meet Burden to Show Prejudice

Even assuming the court should have excluded some or all of CC's testimony, plaintiffs have not met their burden to show prejudice.

To prevail on an evidentiary challenge on appeal, an appellant must establish the evidentiary error was prejudicial, amounting to a miscarriage of justice. (*Christ v. Schwartz* (2016) 2 Cal.App.5th 440, 447; see *F.P. v. Monier* (2017) 3 Cal.5th 1099, 1107-1108 (*F.P.*).) The appellant has the burden to demonstrate it is reasonably probable a result more favorable to the appellant would have been reached without the error. (*Coral Farms, L.P. v. Mahoney* (2021) 63 Cal.App.5th 719, 733.)

Viewed in context, CC's testimony was a small part of the overall trial, and was not central to the parties' theories or arguments. The primary dispute at trial was whether Officer Gonsalves's actions met applicable law enforcement standards. And the jury knew its main task was to decide the reasonableness of Officer Gonsalves's actions based on the information of which he was aware when he encountered and interacted with Olango.

Consistent with these principles, counsel devoted much of their closing arguments to discussing the expert opinions on this issue, and urging the jury to credit their own expert. Defense counsel only once mentioned CC during closing arguments when he briefly noted that CC's description of Olango's eyes was consistent with Dr. Geller's opinions that Olango was likely under the influence of cocaine at the time. In his closing argument, plaintiffs' counsel acknowledged CC's testimony, but strenuously questioned the legitimacy of her opinions, including by reminding the jury she did not

call the police until the next day and instead went to her hair appointment; she reported her fear of Olango only after hearing the substantial media attention to the police shooting; her secretary was married to a detective with the City's police department; and she substantially misrepresented Olango's size, saying she thought he was six feet and 200 pounds (he was five foot six inches). And the jury heard her statement that she saw Olango only for "seconds."

It is also significant to the prejudice analysis that CC's testimony was similar to the testimony of Olango's acquaintance LL (whose testimony is not challenged on appeal) and was consistent with many parts of Lucy's testimony that Olango was acting erratically, would not listen to her, was walking in traffic, and was likely on drugs and/or suffering some kind of mental breakdown. Although CC's testimony added a view that had not been expressed by these other witnesses—that Olango appeared to pose a danger to her and others—we are convinced this small portion of her testimony would not have changed the jury's view of the reasonableness of Officer Gonsalves's actions. The jury was aware—based on the instructions, arguments, and defense expert's testimony—that it must judge the reasonableness of Officer Gonsalves's actions solely on information of which he was aware. Absent any indication to the contrary, we must presume the jury understood and adhered to this principle. Additionally, as we have noted, many parts of CC's testimony supported plaintiffs' theories such as her testimony that Olango appeared to be obviously "unwell" and "needed help."

On our review of the entire record, we are satisfied any error in admitting some or all of CC's testimony did not affect the outcome of the case.

40

### III. Demurrer Rulings

In addition to her negligent infliction of emotional distress claim, Lucy asserted two causes of action against the City: (1) negligent training, supervision, and retention of Gonsalves; and (2) breach of mandatory statutory duty. (Gov. Code, §§ 815.2, 815.6.)[9] On appeal, Lucy contends the court erred in sustaining the City's demurrer without leave to amend on each of these claims.

### A. Background

Lucy's two additional claims against the City were based on the following allegations. In 2013, Officer Gonsalves was a sergeant who commanded the City's police department's (Department) Special Operations Unit. At that time, four female City employees reported that Officer Gonsalves had sexually harassed them and engaged in other "highly inappropriate conduct" with them in the workplace. As a result, the City instituted an investigation to determine whether Officer Gonsalves violated City and Department policies. Beginning in November 2013, while the investigation was ongoing, the Department's command staff (including its police chief and police captain) placed Officer Gonsalves on administrative leave.

In June 2014, the City completed its investigation and imposed discipline on Officer Gonsalves. Specifically, the City (acting through the police chief, police captain and two other management employees) demoted Officer Gonsalves to the police officer rank, removed him from the Special Operations Unit, and prohibited him from applying for any special assignments for three years.

---

[9] In Part III of this opinion, all statutory references are to the Government Code.

41

Based on these alleged facts and her allegations that Gonsalves abused his police powers when he wrongfully shot Olango, Lucy sought to hold the City liable on two pleaded legal theories.

First, Lucy alleged the City was liable for negligent training, supervision, and retention of Officer Gonsalves, and that this negligence "was a substantial factor that caused Gonsalves . . . to *negligently* shoot and kill . . . Olango and cause [Lucy] to suffer severe emotional distress . . . ." (Italics added.)  This cause of action was based on a theory that the City was vicariously liable for its management employees' negligence in performing their supervisory functions.  (§ 815.2.)

Second, Lucy alleged the City could be held directly liable under section 815.6 because it breached a mandatory duty set forth in section 1031, subdivision (f), which (as explained below) requires that police officers meet certain minimum standards, including to be free of emotional or mental conditions affecting the officer's ability to perform the job.  Lucy alleged the City was on notice by 2014 that Gonsalves was mentally and emotionally unfit for the job based on its knowledge of his sexual harassment conduct.  Lucy further alleged the "City's breach of its mandatory duty under [this code section] caused Gonsalves . . . to *improperly* exercise [his] powers as peace officer[ ] and *negligently* shoot and kill [Olango] and cause [Lucy] to suffer severe emotional distress . . . ."  (Italics added.)

The City demurred to these causes of action, arguing that neither claim is supported by applicable law because the allegations do not come within the limited circumstances under which a public entity can be held liable under a tort theory.  The court agreed, and sustained the demurrer without leave to amend.  Lucy challenges this ruling on appeal.

## B. Review Standards

" 'In reviewing an order sustaining a demurrer, we examine the operative complaint de novo to determine whether it alleges facts sufficient to state a cause of action under any legal theory.' " (*Robertson v. Saadat* (2020) 48 Cal.App.5th 630, 639.) "We 'adopt[ ] a liberal construction of the pleading and draw[ ] all reasonable inferences in favor of the asserted claims.' " (*Ibid.*) We assume the truth of all properly pleaded facts, but we disregard " ' "contentions, deductions, [and] conclusions of fact or law." ' " (*McBride v. Smith* (2018) 18 Cal.App.5th 1160, 1173.)

If an appellant establishes a court erred in sustaining a demurrer on a particular cause of action, reversal is not automatic, particularly after a trial. As with evidentiary rulings, a court's pleading-related rulings support a reversal only if the appellant establishes prejudice, i.e., that it is reasonably probable a more favorable result would have been reached in the absence of the error. (*Waller v. TJD, Inc.* (1993) 12 Cal.App.4th 830, 833 (*Waller*); see Cal. Const., art. VI, § 13; *F.P.*, *supra*, 3 Cal.5th at p. 1107; *Cassim v. Allstate Ins. Co.* (2004) 33 Cal.4th 780, 800-801 (*Cassim*); see also *Grell v. Laci Le Beau Corp.* (1999) 73 Cal.App.4th 1300, 1307; *Curtis v. Twentieth Century-Fox Film Corp.* (1956) 140 Cal.App.2d 461, 464-465.)

As explained, we conclude that even assuming the court erred in sustaining the demurrer on either claim (which we do not decide), the error was harmless. Because the jury found Officer Gonsalves was not negligent, and we have rejected challenges to this finding, Lucy could not have satisfied the required causation element in each tort claim against the City.

## C. Analysis

### 1. General Principles

A governmental entity is not liable for an injury unless liability is specifically permitted by a statute. (§ 815; *State Dept. of State Hospitals v. Superior Court* (2015) 61 Cal.4th 339, 348 (*State Hospitals*).)

Lucy relies on two statutes (§§ 815.6, 815.2) in seeking to impose liability on the City for its failure to terminate Officer Gonsalves after notice of his sexual harassment conduct against Department employees. We address each statute below.

### a. Section 815.6: Mandatory Duty

Section 815.6 provides: "Where a public entity is under a mandatory duty imposed by an enactment that is designed to protect against the risk of a particular kind of injury, the public entity is liable for an injury of that kind proximately caused by its failure to discharge the duty unless the public entity establishes that it exercised reasonable diligence to discharge the duty."

To establish public entity liability under this statute, the plaintiff must prove three elements: "(1) a mandatory duty is imposed by an enactment, (2) the duty was designed to protect against the kind of injury allegedly suffered, and (3) breach of the duty proximately caused injury." (*State Hospitals, supra,* 61 Cal.4th at p. 348.)

On the first two elements, Lucy relies on the language in section 1031, subdivision (f) to allege the City had a mandatory duty to terminate Officer Gonsalves once it was on notice of his sexual harassment conduct. That code section states: "Each class of public officers or employees declared by law to be peace officers shall meet all of the following minimum standards: . . . [¶] Be found to be free from any physical, emotional, or mental condition,

44

including bias against race or ethnicity, gender, nationality, religion, disability, or sexual orientation, that might adversely affect the exercise of the powers of a peace officer."

The City responds that this code section does not meet the criteria established by the California Supreme Court to create a mandatory duty because the statute does not create affirmative obligations and has no implementing guidelines, and provides public entities with discretion. (See *State Hospitals*, *supra*, 61 Cal.4th at pp. 348-349; *Guzman v. County of Monterey* (2009) 46 Cal.4th 887, 898 (*Guzman*); *O'Toole v. Superior Court* (2006) 140 Cal.App.4th 488, 510.) The City also relies on the training guidelines underlying section 1031, subdivision (f) to argue the code section applies only to hiring decisions, not retention decisions.

Lucy counters by focusing on the word "shall" in section 1031, subdivision (f), and alternatively urges this court to "impl[y]" a mandatory duty from the statutory language. In support of the latter point, she relies on a decision that has since been disapproved by the California Supreme Court on a related point (*Alejo v. City of Alhambra* (1999) 75 Cal.App.4th 1180; see *B.H. v. County of San Bernardino* (2015) 62 Cal.4th 168, 188, fn. 6) and a high court decision (*Guzman, supra,* 46 Cal.4th 887) finding the asserted implied duty was insufficient to trigger liability under section 815.6. Lucy also argues that various courts have held (in other contexts) that section 1031, subdivision (f) standards for police officer fitness must be maintained throughout the officer's career. (*See Sager v. County of Yuba* (2007) 156 Cal.App.4th 1049, 1058-1059*; White v. County of Los Angeles* (2014) 225 Cal.App.4th 690, 706.)

On our review of the cited authorities, we recognize that existing legal authority supports the City's arguments on the mandatory duty issue and

45

that Lucy is asking this court to extend the rationale of the statutes and judicial decisions to recognize tort liability under the circumstances.

We determine it is unnecessary for us to reach a final resolution on this issue because any error was not prejudicial. (See *Martinez v. San Diego County Credit Union* (2020) 50 Cal.App.5th 1048, 1071 [an appellate court generally will not address an issue unnecessary to the resolution of the appeal]; *Shaw v. County of Santa Cruz* (2008) 170 Cal.App.4th 229, 259; *Thunderbird Investment Corp. v. Rothschild* (1971) 19 Cal.App.3d 820, 828.) Based on the jury's finding that Lucy did not prove Officer Gonsalves was negligent, Lucy could not have established the third element of the section 815.6 mandatory duty claim: that the breach of the mandatory duty "proximately caused injury." (*State Hospitals, supra,* 61 Cal.4th at p. 348.) On this element, a plaintiff has the burden to prove the breach of duty was a "cause in fact" of the claimed injury and that the chain of causation was one in which liability could be imposed as a matter of policy. (*Id.* at p. 352.)

In seeking to plead this causation element in her complaint, Lucy alleged the City's breach of its mandatory duty under section 1031, subdivision (f) "caused Gonsalves . . to *improperly* exercise" his police powers and "*negligently* shoot and kill" Olango, *resulting* in emotional distress to her. (Italics added.) In her appellate briefs, Lucy asserts she met her burden to show prejudicial error on the causation element because had she presented her mandatory duty claim to the jury, the jury "could have determined [the] emotional and mental conditions that disqualified Gonsalves from being employed as a police officer, either *caused* or *contributed* to him *negligently* shooting and killing [Olango]." (Italics added.)

These allegations and arguments make clear Lucy understands she would have been required to show Officer Gonsalves acted wrongfully (i.e.,

46

negligently) to establish her claim the City's breach of its mandatory duty *caused* her to suffer emotional distress. We agree. Lucy's claim she suffered emotional injuries from the City's alleged breach of its mandatory duty in continuing to employ Officer Gonsalves is founded on her allegation that the City's breach resulted in Officer Gonsalves's abusing his powers and *wrongfully* shooting Olango. Because the jury concluded Officer Gonsalves was not negligent and thus did not act wrongfully under the circumstances, a critical link in the causation chain is missing.

Lucy alternatively contends the prejudice from the demurrer ruling is "almost self-evident" because she was prevented from presenting evidence to the jury that Officer Gonsalves was "unfit for duty" based on his sexual harassment conduct two years earlier. However, Lucy does not suggest *this* evidence was relevant to the issue whether Officer Gonsalves was negligent in shooting Olango, i.e., whether the officer acted reasonably under the circumstances. Lucy never asked the court to admit this evidence on her negligence claim, nor is there any basis to find the evidence would have been relevant to this claim. Thus, the court's demurrer ruling did not preclude Lucy from presenting all *relevant* evidence on her negligence claim at trial.

We also find unpersuasive Lucy's argument that the fact she was deprived of a "viable cause of action . . . *alone* prejudiced the case." Although the erroneous pretrial dismissal of a cause of action will usually be prejudicial, this is not always the case. Under our state's constitution, prejudice is never presumed; an appellant has the burden to affirmatively show she has been prejudiced by any alleged error, including pleading errors. (See Cal. Const., art. VI, § 13; *F.P., supra,* 3 Cal.5th at pp. 1107-1108; *Cassim, supra,* 33 Cal.4th at p. 800; see also *Waller, supra,* 12 Cal.App.4th at

47

p. 833; *Brokopp v. Ford Motor Co.* (1977) 71 Cal.App.3d 841, 853-854; *Ravel v. Hubbard* (1952) 112 Cal.App.2d 255, 258.)

### b. Section 815.2: Negligence of Supervisory Personnel

We reach a similar conclusion on Lucy's second claim asserting the City's alleged negligence in failing to terminate Officer Gonsalves after it completed its investigation of his alleged sexual harassment. On this negligence claim, Lucy relies on section 815.2, subdivision (a), which makes a public entity vicariously liable for an employee's negligent acts or omissions "if the act or omission would . . . have given rise to a cause of action against that employee . . . ." Under this statute, Lucy argues the City's management employees could be held liable for negligence in not terminating Officer Gonsalves after the investigation, and therefore the City can be held vicariously liable for this negligence.

The City responds that the courts have held a manager or supervisor generally cannot be held liable for negligently supervising an employee, absent a special protective relationship between the supervisor and the plaintiff. (See *C.A. v. William S. Hart Union High School Dist.* (2012) 53 Cal.4th 861, 869-879 [finding school personnel owe duty of care to students based on the "special relationship" between school district and the district's pupils]; *de Villers v. County of San Diego* (2007) 156 Cal.App.4th 238, 249 [finding no special protective relationship and thus no liability under section 815.2].) The City asserts that under settled law, this type of relationship does not exist between the Department employees and Lucy. (See *Williams v. State of California* (1983) 34 Cal.3d 18, 24, 27-28; see also *Regents of University of California v. Superior Court* (2018) 4 Cal.5th 607, 621.)

Although the City's argument appears persuasive based on existing legal authority, we do not reach a final resolution on the issue because any error was not prejudicial. As with a mandatory duty claim, Lucy was required to show the Department's alleged negligent retention of Gonsalves was a proximate cause of Lucy's injuries (her emotional distress in witnessing the shooting). (See *Phillips v. TLC Plumbing, Inc.* (2009) 172 Cal.App.4th 1133, 1139.) For the same reasons we found the jury's negligence finding precluded a favorable finding on the causation element of her mandatory duty claim, we determine the court's ruling was not prejudicial. Additionally, Lucy forfeited this contention because she made no attempt in her opening or reply brief to argue she was prejudiced by the asserted error on this negligence claim. (*Cahill v. San Diego Gas & Electric Co.* (2011) 194 Cal.App.4th 939, 956.)

## DISPOSITION

We affirm the judgment. The parties to bear their own costs on appeal.

HALLER, Acting P. J.

WE CONCUR:

AARON, J.

GUERRERO, J.